IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

TAMMY L. HERRING          )
                          )
v.                        )          No. 3:04-1093
                          )          Judge Nixon/Brown
JO ANNE B. BARNHART, Commissioner )
of Social Security        )

To:  The Honorable John T. Nixon, Senior Judge

**REPORT AND RECOMMENDATION**

        This is a civil action filed pursuant to 42 U.S.C.
§405(g), to obtain judicial review of the final decision of the
Commissioner of Social Security denying plaintiff disability
insurance benefits ("DIB") and supplemental security income
("SSI"), as provided under Titles II and XVI of the Social
Security Act ("the Act"), as amended.  The case is currently
pending on plaintiff's motion for judgment on the administrative
record (Docket Entry No. 11), to which defendant has responded
(Docket Entry No. 13).  For the reasons stated below, the
Magistrate Judge recommends that plaintiff's motion be **GRANTED**,
and that the decision of the Commissioner be **REVERSED** and the
cause **REMANDED** for further administrative proceedings, to include
if necessary the issuance of a subpoena for the psychotherapy
notes and other treatment records of plaintiff's treating
psychologist.

1

## I.  INTRODUCTION

Plaintiff filed her DIB and SSI applications on June 8, 2001 (Tr. 87-89, 530-33), alleging the onset of disability on January 25, 2000.  Following denials at the initial (Tr. 73-77) and reconsideration (Tr. 80-81, 543-44) stages of agency review, plaintiff filed a timely request for hearing before an Administrative Law Judge ("ALJ") (Tr. 82).  That hearing was held on September 5, 2003 (Tr. 37-67).  On March 18, 2004, the ALJ issued a written decision denying plaintiff's applications (Tr. 13-24).  The ALJ made the following findings:

1.   The claimant met the insured status requirements of the Act as of the alleged disability onset date, and continued to meet them through September 30, 2002.

2.   The claimant has not engaged in substantial gainful activity since the alleged onset date.

3.   The claimant has "severe" impairments, including mild residuals of bilateral carpal tunnel syndrome, lumbar spinal disc disease and a left shoulder impingement syndrome.

4.   The claimant's impairments, considered individually and in combination, do not meet or equal in severity any impairment set forth at 20 CFR Part 404, Subpart P, Appendix One.

5.   The claimant's subjective allegations of disabling pain and functional limitations are not credible.

6.   The claimant retains the residual functional capacity to perform light work that does not require climbing of ladders, ropes or scaffolds or more than occasional stooping.

7.   The past relevant work as a medical file clerk, a day care worker and a cashier is not precluded by the residual functional capacity.

2

8.  The claimant has not been disabled within the meaning
    of the Act through the date of this decision.

(Tr. 23).

        On October 27, 2004, the Appeals Council denied
plaintiff's request for review of the decision of the ALJ (Tr. 5-
7), thereby rendering that decision the final decision of the
Commissioner.  This civil action was thereafter timely filed, and
the Court has jurisdiction.  42 U.S.C. § 405(g).  If the
Commissioner's findings are supported by substantial evidence,
based on the record as a whole, then these findings are
conclusive.  Id.


## II.  REVIEW OF THE RECORD

### Carpal Tunnel Syndrome

        The record indicates that plaintiff underwent carpal
tunnel release by Dr. Behar on her left wrist in June 2000 (Tr.
159-160).  Notes indicated that she recuperated uneventfully with
good resolution of symptoms from the left carpal tunnel release
and in July 2000, she elected to undergo carpal tunnel release on
her right wrist (Tr. 155-158).  Follow up notes from Dr. Behar on
July 21, 2000, indicate that she had no complaints, her right
hand was healing well, range of motion was preserved (with the
exception of full wrist activity), and there was improvement
noted in the paresthesias (Tr. 163).  She also reported
improvement in her left hand with regard to pain and

Case 3:04-cv-01093   Document 14   Filed 08/04/05   Page 3 of 31 PageID #: 3

paresthesias. Id. She was cautioned to avoid strenuous or repetitive activities or lifting more than 5 pounds with her left hand until July 31, 2000. Id. Dr. Behar also indicated that these restrictions would also apply to her right hand until August 21, 2000. Id. Dr. Behar was pleased that plaintiff had done so well. Id. Notes from September 1, 2000, indicate that plaintiff reported dramatic improvement in the paresthesias of her left hand (Tr. 162). In terms of her right hand, she reported some residual paresthesias in the tip of her index finger and a little bit in her volar thumb, some loss of grip strength and a sense of weakness and some pain particularly in the right palm. Id. However, the pain no longer radiated to her shoulder and she reported that she was planning to start training as a nurse technician. Id. Dr. Behar found that she had residual pain and tenderness with loss of grip strength bilaterally as a result of carpal tunnel syndrome and carpal tunnel release. Id. He encouraged her to do what she could to increase her grip strength through exercises, as much as tolerated, and prescribed her Relafen for her residual inflammation. Id. Dr. Behar found that in reference to the AMA Guide to the Evaluation of Permanent Impairment, Fourth Edition, he believed that plaintiff had "mild symptoms of residual medium nerve compression consistent with a 10% impairment of the upper extremity bilaterally." Id.

4

Mental Health

Plaintiff underwent a psychiatric evaluation by Dr. Narciso Gaboy in August 2000 (Tr. 489-490). Plaintiff reported that her marriage was failing, she complained of inability to sleep, loss of appetite, loss of weight, and problems concentrating on a task (Tr. 489). She was depressed most of the day, but not every day, and she was not suicidal. Id. Mental status exam revealed that she was pleasant and cooperative, her speech was fluent, spontaneous and goal directed, her mood was angry and dysphoric, her affect was anxious, worried and nervous, she had a logical thought process and a normal thought content (Tr. 490). Her concentration and judgment were not impaired and her memory was intact. Id. Dr. Gaboy diagnosed major depressive disorder recurrent moderate. Id. Plaintiff's current stressor was the separation from her spouse. Id. She was given Ambien and Remeron. Id. Notes from September and November 2000 indicate that the source of plaintiff's anxiety was her mentally ill spouse (Tr. 486, 487, 488). There are no mental health treatment notes in the record for 2001.

On August 14, 2001, plaintiff underwent a psychological evaluation by Dr. Thelma Foley, consultative examiner (Tr. 324-326). Plaintiff reported that she had been receiving psychological treatment for approximately nine years from Dr. McElroy and that she was hospitalized for two days in 1997 for

5

depression[1] (Tr. 234). She said that her depression started from problems with her husband and then worsened since surgery in June of last year. <u>Id.</u> She said she feels fine in the morning and becomes depressed around 4:00 p.m. <u>Id.</u> She said she cried a lot but was able to sleep unless her back pain bothered her. <u>Id.</u> She takes hydrocodone (1 every 6 hours for pain as needed). <u>Id.</u> Plaintiff drove herself to the evaluation and came alone to the office (Tr. 325). Dr. Foley found that plaintiff was cooperative, and her affect and mood were appropriate, and her speech was spontaneous, coherent, and relevant. <u>Id.</u> Plaintiff denied suicidal attempts or ideation, hallucinations, delusions, or other psychotic symptoms. <u>Id.</u> She was fully oriented, able to give an adequate personal history, had an adequate fund of general information, and had adequate judgment. <u>Id.</u> In terms of activities, plaintiff reported that she gets up at 7:00 in the morning, she limbers up to relieve stiffness and then takes a half mile walk (Tr. 326). She said she goes to her sister's

---

[1]There is only one treatment record dated June 2, 2003, from Dr. McElroy contained in the administrative record (Tr. 528-529). The record contains references to an extended treatment relationship with Dr. McElroy, (<u>see</u> Tr. 185 - a record from Summit Medical Associates dated January 26, 1998, notes that she was seeing Dr. McElroy with her husband but states that "her husband was identified as the sick one and not her," Tr. 489 - Notes from Dr. Gaboy from August 2000 mention a past treatment history with Dr. McElroy, Tr. 481 - Dr. Gaboy noted in 2002 that plaintiff was receiving individual counsel from Dr. McElroy, Tr. 519 - hospital discharge note stating "[s]he has been with Dr. McElroy for eight years prior to admission"). There is also no record of a hospitalization in 1997 for depression in the administrative record. However, there is mention in treatment records from Summit Medical Associates dated September 8, 1997, that plaintiff underwent inpatient psychiatric treatment in July 1997, was placed on Buspar, and had been doing well since (Tr. 189).

house because it keeps her from being depressed and that she does her physical therapy in her sister's pool. Id. She rarely cooks because most of the time her sister fixes her meals. Id. However, she can cook food in the microwave or heat soup if someone helps her open the can. Id. She goes home late in the afternoon where she does more exercises and takes a nap. Id. She attends church on Sunday morning and sometimes eats out. Id. She reported that she has friends and gets along well with people. Id. Dr. Foley did not diagnose plaintiff with any mental impairment. Id. Dr. Foley found that plaintiff's concentration and persistence was adequate, she would be able to manage her funds, understand and remember instructions, maintain appropriate grooming, relate adequately to supervisors and coworkers and would be aware of normal hazards and able to travel independently. Id.

Plaintiff resumed treatment with Dr. Gaboy in April 2002 (Tr. 483). Dr. Gaboy put her on Wellbutrin and on April 15, 2002, she reported that it was helping her depression and she was not as anxious. Id. Dr. Gaboy advised plaintiff that he was going on vacation and that she should go to the emergency room if she needed emergency care. Id.

The record indicates that on May 15, 2002, plaintiff was treated at Tennessee Christian Medical Center by Dr. Okpaku after taking an overdose of some Ativan tablets (Tr. 382).

7

Plaintiff reported that she had been depressed on and off for some time and that she was hospitalized for depression in 1997 after she got divorced, but that upon her discharge she had gotten some relief. Id. Currently, she said she cried a lot, her sleep was off, her energy was way down, and her appetite was also down. Id. Dr. Okpaku noted as an asset that plaintiff felt that she was pretty outgoing most of the time. Id. Plaintiff reported that after her divorce she met a man in the park and she stated that they had been together for about a year or so. Id. He told her that he was thinking about getting a divorce from his wife or he was divorced, but recently he said he was going back to his wife. Id. On examination, plaintiff was sad and depressed but she denied any hallucinations, her fund of knowledge was good, her speech was clear and coherent, her associations were intact, her logic was linear and goal directed, and her insight and judgment were fair (Tr. 383). She was diagnosed with major depressive disorder, recurrent and dependent personality. Id.

Notes from Dr. Gaboy dated June 13, 2002, indicate that plaintiff reported several episodes of anxiety and feeling depressed and that her admission to the hospital was due to panic from the loss of her job, a break up with her married partner, and the fact that her daughter was leaving her (Tr. 481). Notes from Dr. Gaboy dated July 15, 2002 state that Ativan relieved

8

plaintiff's anxiety and Wellbutrin helped her depression (Tr. 479). Plaintiff complained of poor short-term memory at her August 15, 2002, visit with Dr. Gaboy (Tr. 477). Dr. Gaboy, however, performed the Mini Mental Status Examination, and the result was normal. Id.

Plaintiff did not return to Dr. Gaboy until six months later in February 2003, at which time she complained of feeling overwhelmed due to her daughter delivering a baby, her son graduating in May, and a problem with her relationship with her partner (Tr. 485). She was started on new medication. Id. Notes from Dr. Gaboy dated April 15, 2003, indicate that an adjustment in medication had made plaintiff sleep better, be calmer, and not be preoccupied with thoughts pertaining to her divorce and problems with her children (Tr. 469).

The record indicates that in May 2003, plaintiff "made a suicidal gesture" by taking a "non-toxic overdose" and then going to the emergency room (Tr. 518, 498). She was admitted as an inpatient and discharged three days later. Notes indicate that she began seeking discharge soon after admission. Id. Discharge notes state that plaintiff was recently divorced and was having problems with her current boyfriend and had financial problems as well (Tr. 518). She was released in stable condition but with a poor prognosis, with a Global Assessment of

Functioning (GAF) of 55 at discharge, and 60 for the last year.[2]
Id.

On June 2, 2003, Dr. McElroy completed a form regarding plaintiff's ability to do work-related activities (mental) (Tr. 525-526). Dr. McElroy found that out of a total of 25 categories, plaintiff had "no useful ability to function" or was "unable to meet competitive standards" in 24 categories, and was seriously limited but not precluded in the remaining 1 area. Id. Dr. McElroy commented that plaintiff had short and long term memory problems, and because of her depression and anxiety even simple tasks are difficult for her to do. Id. He also commented that plaintiff had "several hospitalizations" for suicidal ideation in the past year, as well as for anxiety and depression (Tr. 526). A clinical summary form completed the same day indicate that plaintiff had attended 110 sessions of therapy with Dr. McElroy (20 couple/family therapy and 90 individual sessions) (Tr. 528). Dr. McElroy found that plaintiff had a GAF of 53 current and 55 for the past year. Id.

_____

[2]A patient's GAF score reflects the "clinician's judgment of the individual's overall level of functioning" on a 0-100 scale. A 51-60 rating indicates moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning, (e.g. few friends, conflicts with peers or co-workers). Diagnostic and Statistical Manual of Mental Disorders (DSM-IV), 30, 32 (4th Ed. 1994).

Case 3:04-cv-01093   Document 14   Filed 08/04/05   Page 10 of 31 PageID #: 10

Musculoskeletal

An x-ray of plaintiff's cervical spine was taken on
September 28, 2000, due to complaints of neck pain after a motor
vehicle accident (Tr. 201). It indicated mild C5-6 disk space
narrowing and mild straightening of the lordosis but the overall
impression given was no osseous abnormality. Id. Plaintiff
started treatment with Dr. Mark Totty in October 2000 (Tr. 263-
267). His intake impression was that plaintiff had acute
traumatic cervical, thoracic, and lumbar strain with articular
dipkinesia and radiculitis and possible fracture of the right 4th
metatarsal (Tr. 266). Plaintiff reported a pain level of 5-6/10
(Tr. 264). The treatment plan was joint mobilization followed
with physical therapy modalities. Id. A CT scan taken later in
October 2000 was negative for a right foot fracture (Tr. 240).

A lumbar MRI taken in November 2000 showed no
significant disk bulging, and only mild stenosis and facet
disease (Tr. 226). Notes from Dr. Totty, dated November 9, 2000,
indicate that plaintiff complained of back and leg pain at a
reduced intensity of 4/10. Id. Although she asserted that her
condition caused interference with daily activities, she also
noted that her medication was helping, and that her condition was
better compared with her previous visit. Id. Objective findings
were muscle spasms in L4-L5, mild to moderate point tenderness in
the right SI joint, mildly tight muscle fibers in C1-C2 area and

11

mild to moderate tightness in the L4-L5 area. Id. Plaintiff's
lumbar range of motion was restricted with pain on flexion and
extension. Id. However, her posture and gait were normal and
her minor sign was negative. Id. Dr. Totty indicated that
plaintiff was getting treatment to the cervical and lumbar spine
and that plaintiff reported good relief following joint
mobilization. Id.

In December 2000, plaintiff resumed treatment with Dr.
O'Brien, having last seen him in October 1998 for treatment of
back pain (Tr. 309). Plaintiff reported that she had been doing
relatively well until she was involved in a motor vehicle
accident in September 2000. Id. Since the accident she reported
a severe increase in back pain and leg numbness which was brought
on by sitting, standing, bending, and twisting. Id. Exam of the
lumbar spine showed tenderness to palpation across the
lumbosacral junction, positive sciatic notch tenderness on the
right and straight leg raising on the right at 40 degrees caused
pain. Id. There was no muscle spasm. Id. In terms of range of
motion in her back, plaintiff was able to bring her fingertips to
mid-tibia with the knees extended, extend approximately 25
degrees (out of 30), and lateral bend to the left and to the
right 20 degrees (out of 30). Id. She had full motor strength
in her lower extremities, there was no evidence of wasting or
atrophy, and sensation was intact. Id. Dr. O'Brien noted that a

12

November 2000 MRI showed decreased disc signal at L4-5 and L5-S1, with no disc herniation, some facet hypertrophy causing stenosis in the recesses.  Id.  Recommended treatment included epidural steroid injection and Ultram.  Id.  Follow up notes indicated that plaintiff reported no relief from the epidural steroid injection (Tr. 307).

On January 18, 2001, plaintiff had back surgery to address complaints of back and leg pain and failed conservative measures (Tr. 268).  Plaintiff was discharged on January 22, 2001, in stable condition with no complaints.  Id.  Follow up notes from March 15, 2001 indicate that plaintiff complained of ongoing back and leg pain (Tr. 304).  Plaintiff's incision was healed and there was some swelling over the paraspinous muscles but no redness, erythema or fluctuance.  Id.  She had mild muscle spasm and range of motion was extremely limited.  Id.  Exam showed full motor strength in the lower extremities and no evidence of wasting or atrophy.  Id.  Dr. O'Brien released plaintiff from work for two months, indicated that she was at maximum medical improvement, and gave her 12% permanent partial impairment.  Id.

The record contains a letter from Dr. O'Brien dated March 26, 2001, stating that plaintiff was still having some ongoing back and leg pain secondary to nerve root inflammation which may take some time to resolve and may not ever completely

13

resolve (Tr. 303).  Dr. O'Brien reiterated that plaintiff had a
12% permanent partial impairment and also found that he did
anticipate permanent lifting restrictions which would be in the
neighborhood of no lifting greater than 25 pounds, and limited
bending and stooping.  Id.

Plaintiff underwent a neurologic evaluation by Dr.
Martin Wagner, on April 23, 2001 (Tr. 285-286).  Plaintiff
reported that her pain lessened considerably following her back
surgery but that she still had some pain down the posterior
lateral right lower extremity especially at night (Tr. 285).  She
took Hydrocodone about twice a week to treat this pain.  Id.  On
examination, plaintiff's neck was supple with a full range of
motion without point tenderness, muscle spasm or bruit (Tr. 286).
She had normal strength and normal tone in all four extremities
without any muscle atrophy, and sensory exam was normal in the
upper and lower extremities.  Id.  Coordination was intact to
finger-to-nose and heel-to-shin, and she had normal fine motor
coordination of both hands.  Id.  Gait was normal and she was
able to heel, toe and tandem walk normally (although she did
complain of increased low back pain with heel walking on the
right).  Id.  Dr. Wagner found that she had chronic headaches of
the rebound type secondary to daily analgesic overuse since her
2001 lumbar surgery; status post bilateral carpal tunnel
decompression surgery in 2000 with mild symptoms in the right

14

hand; status post multiple lumbar surgeries in 2001 with laminotomies and fusion procedure with minimal symptoms into the right lower extremity; and a history of complex partial epilepsy well controlled, last seizure in 1998. Id.

Notes from Dr. O'Brien from May 14, 2001, indicate that plaintiff still reported ongoing severe back and leg pain (Tr. 302). Examination showed a healed surgical incision, tenderness over the paraspinous muscles and mild muscle spasm, and an extremely limited range of motion. Id. X-rays showed no change in the sagittal or coronal plane alighment. Id. Dr. O'Brien found that at this point, plaintiff was not able to work, and he decided to keep her off of work, and dictate a letter for social security. Id. Dr. O'Brien's note stated that at the time of the surgery he noted that plaintiff had permanent nerve damage and postoperatively, she had been left with severe debilitating back and leg pain (Tr. 301). Dr. O'Brien asserted that plaintiff had not been able to work since January 2000 because of a combination of her carpal tunnel syndrome and severe debilitating back pain. Id. Dr. O'Brien found that postoperatively, he did not feel that plaintiff was going to improve, and she would have ongoing severe back and leg symptoms. Id. Dr. O'Brien stated that plaintiff will be severely limited in her physical capabilities and will not be able to lift more than five pounds and not be able to sit for more than five to ten minutes at a time. Id.

15

Plaintiff was evaluated for rehabilitative therapy on May 16, 2001 (Tr. 318-320). Plaintiff was able to walk a half mile, sit comfortably for 15 minutes and stand comfortably for 10 minutes. Id. The evaluator determined that plaintiff required skilled rehabilitative therapy in conjunction with a home exercise program to address her problems and that her overall rehabilitation potential was good. Id. In June 2001, plaintiff had an x-ray taken of her left shoulder after she reported that she hurt herself falling out of bed (Tr. 357). The x-ray was normal. Id. She was diagnosed with a sprain and provided with a sling (Tr. 431).

Notes from Dr. O'Brien's office dated July 11, 2001, state that plaintiff was having less back and leg pain and her back incision was healed without swelling, redness, or erthema (Tr. 462). She had mild tenderness in the right buttock, negative muscle spasm, negative straight leg raise, and normal motor and sensory examinations. Id.

Plaintiff was evaluated in August 2001 by Dr. Bruce Davis (Tr. 321-323). Plaintiff was in no acute distress (Tr. 322). Plaintiff was five foot four inches tall and weighed 254 pounds, and her vision was right 20/20, left 20/20, both 20/20. Id. Musculoskeletal examination showed full motion and good strength in the neck. Id. Plaintiff had left shoulder pain that limited abduction to 120 degrees (out of 150) but she had normal

16

elbow motion.  Id.  Plaintiff had normal motion in her wrists and fingers, but had a mild grip weakness (4/5).  Id.  Examination of her back showed thoracolumbar flexion and right hip flexion of 90 degrees, right straight leg raising to 30 degrees, knee flexion to 30 degrees, and she was able to squat.  Id.  She had a normal gait and performed normal gait maneuvers across the exam room without assistance.  Id. Dr. Davis diagnosed plaintiff with class 3 extreme obesity, shoulder bursitis, carpal tunnel release, lumbar disc surgery with limitations as described, seizure disorder controlled on medications, depression, congenital cataract surgery with poor right vision (Tr. 323).  In terms of functional abilities, Dr. Davis found that plaintiff could lift 20 pounds occasionally and 10 pounds frequently, she could sit for 8 hours in an 8 hour workday but could stand and walk less than 6 hours in an 8 hour workday and was limited in overhead reaching.  Id.  Plaintiff also was limited in her exposure to heat and humidity, and in climbing and working at heights due to her poor right vision and as seizure precautions.  Id.

Notes from Dr. O'Brien's office dated November 9, 2001, indicate that plaintiff complained of back, leg, and left shoulder pain (Tr. 461).  Dr. O'Brien found that examination of her left shoulder showed marked positive impingement signs, and she complained of pain with abduction and forward flexion greater than 90 degrees, but had no wasting or atrophy.  Id.

17

An MRI of plaintiff's lumbar spine was taken on
November 20, 2001 (Tr. 466). It showed changes status post
laminectomy at the L5 level, the intervertebral discs appeared
intact without evidence of herniation, the spinal canal and
neural formina appeared intact without evidence of nerve root
impingement, and there was minimal enhancement surrounding the
thecal sac at the L5-S1 level consistent with some mild
postoperative scarring. Id. An MRI was also taken of
plaintiff's left shoulder in November 2001 (Tr. 465). It showed
"some abnormal signal surrounding the lateral rotator cuff, most
consistent with peritendinitis, no evidence of frank rotator cuff
tear, and no evidence of impingement." Id.

At a December 5, 2001, visit, plaintiff complained of
continued shoulder pain as well as dysesthesias radiating into
her arm at night (Tr. 459). Examination of the upper extremities
showed full motor strength, no evidence of wasting or atrophy,
and sensation was intact. Id. Dr. O'Brien felt that plaintiff's
symptoms were likely secondary to impingement syndrome, however,
since she had a component of cervical radiculopathy, he sent her
for an MRI of her cervical spine. Id.

An MRI of plaintiff's cervical spine was taken on
December 10, 2001 (Tr. 463). The results showed very early
degenerative disc disease at C5-6 and C4-5 without evidence of
nerve root of spinal cord impingement. Id. Notes from Dr.

18

O'Brien's office dated January 2, 2002 indicate that plaintiff was having ongoing left shoulder symptoms which Dr. O'Brien felt were due to rotator cuff inflammation and impingement syndrome (Tr. 458). Dr. O'Brien recommended surgery. Id. On January 16, 2002, plaintiff had arthroscopic surgery and subacromial decompression on her left shoulder (Tr. 456-457). Post operative follow up notes indicate that plaintiff did not do her physical therapy because her daughter was pregnant and was having difficulties with premature labor (Tr. 452,453, 454). Notes from April 3, 2002 indicate that she had limited range of motion and Dr. O'Brien found that she needed to aggressively pursue active and passive exercises (Tr. 453). Notes from May 29, June 26, and September 13, 2002 indicate that plaintiff had steady increases in range of motion in her shoulder due to doing self-directed exercises in the pool (Tr. 449, 450, 451).

State Agency RFC Assessments

In August 2001, Dr. Mona Mishu, a State Agency Medical Consultant, reviewed plaintiff's records and determined that she could lift 20 pounds occasionally and 10 pounds frequently, stand or walk for about 6 hours in an 8 hour day, was limited in reaching with her left arm, and limited to occasional climbing (Tr. 329, 330, 331). In September 2001, Dr. Welch, a State Agency Mental Health Consultant, reviewed plaintiff's records and determined that she had no medically determinable mental

19

impairment (Tr. 336, 348).

In January 2002, Dr. Lawrence Schull, a State Agency Medical Consultant, reviewed plaintiff's records and found that she could lift 20 pounds occasionally and 10 pounds frequently, sit, stand, or walk for about 6 hours in an 8 hour day, push, and pull, occasionally stoop, and never climb ladders (Tr. 373, 374).

### III.  CONCLUSIONS OF LAW

#### A.  <u>Standard of Review</u>

This Court's review of the Commissioner's decision is limited to the record made in the administrative hearing process. <u>Jones v. Secretary</u>, 945 F.2d 1365, 1369 (6th Cir. 1991).  The purpose of this review is to determine (1) whether substantial evidence exists in the record to support the Commissioner's decision, and (2) whether any legal errors were committed in the process of reaching that decision.  <u>Landsaw v. Secretary</u>, 803 F.2d 211, 213 (6th Cir. 1986).

"Substantial evidence" means "such relevant evidence as a reasonable mind would accept as adequate to support the conclusion." <u>Her v. Commissioner</u>, 203 F.3d 388, 389 (6th Cir. 1999)(<u>citing</u> <u>Richardson v. Perales</u>, 402 U.S. 389, 401 (1971)). It has been further quantified as "more than a mere scintilla of evidence, but less than a preponderance." <u>Bell v. Commissioner</u>, 105 F.3d 244, 245 (6th Cir. 1996).  Even if the evidence could

20

also support a different conclusion, the decision of the ALJ must stand if substantial evidence supports the conclusion reached. Her, 203 F.3d at 389 (citing Key v. Callahan, 109 F.3d 270, 273 (6th Cir. 1997)). However, if the record was not considered as a whole, the Commissioner's conclusion is undermined. Hurst v. Secretary, 753 F.2d 517, 519 (6th Cir. 1985).

## B. Proceedings at the Administrative Level

The claimant has the ultimate burden to establish an entitlement to benefits by proving his or her "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). At the administrative level of review, the claimant's case is considered under a five-step sequential evaluation process, as follows:

(1)  If the claimant is working and the work constitutes substantial gainful activity, benefits are automatically denied.
(2)  If the claimant is not found to have an impairment which significantly limits his or her ability to work (a "severe" impairment), then he or she is not disabled.
(3)  If the claimant is not working and has a severe impairment, it must be determined whether he or she suffers from one of the "listed" impairments[3] or its equivalent; if a listing is met or equaled, benefits are owing without further inquiry.
(4)  If the claimant does not suffer from any listing-level impairments, it must be determined whether the claimant can

---

[3] The Listing of Impairments is found at 20 C.F.R., Pt. 404, Subpt. P, Appendix 1.

Case 3:04-cv-01093   Document 14   Filed 08/04/05   Page 21 of 31 PageID #: 21

return to the job he or she previously held in light of his or her residual functional capacity (e.g., what the claimant can still do despite his or her limitations); by showing a medical condition that prevents him or her from returning to such past relevant work, the claimant establishes a <u>prima facie</u> case of disability.

(5) Once the claimant establishes a <u>prima facie</u> case of disability, it becomes the Commissioner's burden to establish the claimant's ability to work by proving the existence of a significant number of jobs in the national economy which the claimant could perform, given his or her age, experience, education, and residual functional capacity.

<u>Moon v. Sullivan</u>, 923 F.2d 1175, 1181 (6th Cir. 1990).

The Commissioner's burden at the fifth step of the evaluation process can be carried by relying on the medical-vocational guidelines, otherwise known as "the grid," but only if the claimant is not significantly limited by a nonexertional impairment, and then only when the claimant's characteristics identically match the characteristics of the applicable grid rule. Otherwise, the grid can not be used to direct a conclusion, but only as a guide to the disability determination. <u>Id.</u> In such cases where the grids do not direct a conclusion as to the claimant's disability, the Commissioner must rebut the claimant's <u>prima facie</u> case by coming forward with particularized proof of the claimant's individual vocational qualifications to perform specific jobs, which is typically obtained through vocational expert (VE) testimony. <u>See</u> <u>Varley v. Secretary</u>, 820 F.2d 777, 779 (6th Cir. 1987).

In determining residual functional capacity (RFC) for

22

purposes of the analysis required at steps four and five above, the Commissioner is required to consider the combined effect of all the claimant's impairments, mental and physical, exertional and nonexertional, severe and nonsevere.  See 42 U.S.C. § 423(d)(2)(B).

### C. Plaintiff's Statement of Errors

Plaintiff alleges that the ALJ erred in finding that she had no "severe" mental impairment; in his treatment of the evidence from plaintiff's mental health treating sources; in his finding of an RFC for light work; and in his evaluation of the credibility of plaintiff's subjective complaints.  As explained below, the undersigned must conclude that the ALJ's treatment of plaintiff's mental impairments was deficient, and specifically that his failure to subpoena the treatment notes of Dr. McElroy, plaintiff's long time treating psychologist, was an abuse of discretion requiring reversal and remand.

As referenced in the record review above, Dr. McElroy is plaintiff's longstanding treating psychologist, having seen plaintiff on over one hundred occasions since August 1997 (Tr. 528).  Dr. McElroy evidently declined plaintiff's request to turn over his psychotherapy notes and other documentation of these therapy sessions, but submitted a treatment summary and medical source statement of ability to do work related activities in lieu of such records (Tr. 525-529).  These documents reflect Dr.

23

McElroy's opinion that plaintiff's major depressive disorder and generalized anxiety disorder are crippling with regard to her work related abilities.  Dr. McElroy presumably also declined the state agency's request for such records, although there is no mention in the record of either the agency's request or Dr. McElroy's declination.  Of course, it stands to reason that he would refuse to disclose his psychotherapy notes to the government, as the government form used to procure plaintiff's authorization and request for such disclosures by treating sources specifically excludes "psychotherapy notes" from its purview (Docket Entry No. 8, Exh. 1).

This exclusion of psychotherapy notes is in response to the requirements of the Health Insurance Portability and Accountability Act of 1996 (HIPAA) and the regulations promulgated thereunder.  The regulatory definition of "psychotherapy notes" is as follows:

> *Psychotherapy notes* means notes recorded (in any medium) by a health care provider who is a mental health professional documenting or analyzing the contents of conversation during a private counseling session or a group, joint, or family counseling session and that are separated from the rest of the individual's medical record.  *Psychotherapy notes* excludes medication prescription and monitoring, counseling session start and stop times, the modalities and frequencies of treatment furnished, results of clinical tests, and any summary of the following items: Diagnosis, functional status, the treatment plan, symptoms, prognosis, and progress to date.

45 C.F.R. § 164.501.  Pursuant to this definition, Dr. McElroy

provided the above referenced summary of information excluded from the definition of psychotherapy notes.  Plaintiff argues that this production should have been sufficient to support Dr. McElroy's assessment of her limitations, as it is the best available evidence of plaintiff's course of treatment, given the apparently sacrosanct nature of psychotherapy notes under federal privacy law.

The ALJ, however, insisted that the summary could not be accepted without comparison to the contemporaneous evidence of plaintiff's treatment by Dr. McElroy.  The undersigned cannot find fault with this insistence, as it is well established practice for agency adjudicators to compare summary assessments with the information gathered during prior treatment of a claimant's impairments.  The ALJ noted that the burden of producing supporting evidence is on plaintiff, stating as follows:

> Claimants are ultimately responsible for obtaining and providing the evidence to support their claims for benefits.  20 CFR 404.704.  This expectation is especially reasonable in this case, where: 1) the claimant is represented by an attorney; 2) there has been a 6-month opportunity following the hearing to either secure and submit supporting evidence from an individual reported to be a long term treatment source or explain why it could not be secured and submitted; and 3) a potentially dispositive opinion has been secured and submitted from the medical source.

(Tr. 21).  Plaintiff responds that he did in fact request Dr. McElroy's records, using a form patterned after the government

form which excludes psychotherapy notes from the authorization and request for disclosure. Of course, without plaintiff's express authorization and request for such notes, Dr. McElroy quite properly refused to disclose them. While the undersigned cannot fault plaintiff's counsel for using the government's authorization form as a model for his own, the HIPAA regulations clearly establish that with the proper authorization, a mental health care provider is <u>permitted</u> to disclose such notes to the individual who received the treatment. 45 C.F.R. §§ 164.502(a)(1)(i), 164.508(a)(2). However, such disclosure would not have been <u>required</u>, even if plaintiff had specifically authorized and requested production of the "psychotherapy notes" made by Dr. McElroy, as the HIPAA regulations establish that patients have no right of access to such notes. 45 C.F.R. § 164.524(a)(1)(i). Nonetheless, it does not appear that Dr. McElroy has to this point even been authorized by plaintiff to produce his psychotherapy notes if he were so inclined, much less specifically requested to disclose those protected notes.

Of course, having presumed that the psychotherapy notes were unavailable through normal channels, what counsel should have done is request a subpoena for Dr. McElroy's notes, pursuant to 20 C.F.R § 404.950(d), which provides as follows:

> (d) Subpoenas. (1) When it is reasonably necessary for the full presentation of a case, an administrative law judge or a member of the Appeals Council may, on his or her own initiative or at the request of a party, issue

26

subpoenas for the appearance and testimony or witnesses
and for the production of books, records,
correspondence, papers, or other documents that are
material to an issue at the hearing.
(2) Parties to a hearing who wish to subpoena documents
or witnesses must file a written request for the
issuance of a subpoena with the administrative law
judge or at one of our offices at least 5 days before
the hearing date. ...

A subpoena accompanied by an order of the ALJ should secure the

information in question, as provided in the HIPAA regulations at

45 C.F.R. § 164.512(e):

(e) *Standard: Disclosures for judicial and
administrative proceedings.*
(1) *Permitted disclosures.* A covered entity may
disclose protected health information in the course of
any judicial or administrative proceeding:
(i) In response to an order of a court or
administrative tribunal, provided that the covered
entity discloses only the protected health information
expressly authorized by such order;

See also Kalinoski v. Evans, --- F.Supp.2d ----, 2005 WL 1653569,

*2 n.3 (D.D.C. July 12, 2005)("However, it does not follow from

the fact that a patient is not allowed to inspect her own notes

under section 164.524(a)(1)(i) that a court order plus a patient

authorization are insufficient to permit the production of notes

in a court proceeding. ... [T]here is no indication that the

intent of the HIPAA regulations were to shield psychotherapy

notes entirely from discovery in a judicial proceeding.").

As noted by the ALJ, plaintiff was represented by

counsel at all relevant times. Counsel was notified in writing

prior to plaintiff's hearing of his right to request an

27

administratively issued subpoena to obtain documents (Tr. 83).
Failure to take advantage of this option could be viewed as a
failure to carry the burden of proof placed on claimants (as
intimated by the ALJ), or as precluding the argument that the
lack of supporting documentation is not fatal to Dr. McElroy's
assessment. See Richardson v. Perales, 402 U.S. 389, 404-05
(1971).

However, despite counsel's failure to request a
subpoena, the particular facts of this case lead the undersigned
to conclude that it was an abuse of discretion for the ALJ to
fail to pursue Dr. McElroy's treatment notes on his own. As
stated in § 404.950(d)(1), the ALJ in his discretion may cause a
subpoena to issue "[w]hen it is reasonably necessary for the full
presentation of a case". See also Berger v. Sec'y of Health &
Human Svcs., 835 F.2d 635, 640 (6th Cir. 1987). Here, the ALJ was
aware of the considerable length of the treatment relationship
between plaintiff and Dr. McElroy, himself recognizing the
"potentially dispositive" nature of such a long term source's
opinion (Tr. 20-21). The critical need in this case for
receiving Dr. McElroy's psychotherapy notes is further
underscored by the fact that without them, the potentially
dispositive summary assessment was not only inconclusive of the
issue of plaintiff's disability, it was so devalued that the ALJ
found plaintiff's mental impairment to be nonsevere, i.e.,

28

"totally groundless".  <u>Farris v. Sec'y of Health & Human Svcs.</u>,
773 F.2d 85, 89 & n.1 (6th Cir. 1985).[4]

The Fourth Circuit Court of Appeals addressed the issue
of an ALJ's discretion to refuse to subpoena treatment notes from
a treating physician in the unpublished case of <u>Gray v. Apfel</u>,
191 F.3d 447, 1999 WL 710362 (4th Cir. Sept. 13, 1999), stating
that

> The limits of that discretion are of course drawn not
> only by the particular factual situation, but also by
> the substantive law governing disability adjudications.
> Unlike their colleagues in other agencies, Social
> Security ALJ's are not simply arbiters, but also
> inquisitors.  They have a duty to "to inquire fully
> into each issue."  Indeed, in its own regulations, the
> Social Security Administration promises to assist
> claimants in developing an adequate medical record:
>
> > *Our responsibility*.  Before we make a
> > determination that you are not disabled, we will
> > develop your complete medical history for at least
> > the 12 months preceding the month in which you
> > file your application unless there is a reason to
> > believe that development of an earlier period is
> > necessary or unless you say that your disability
> > began less than 12 months before you filed your

---

[4]Even if Dr. McElroy's notes do not bear out his dire summary
assessment, the undersigned must agree with plaintiff that the ALJ's finding
of no severe mental impairment is patently erroneous.  While this finding is
supported by the report of Dr. Thelma Foley, a consulting Licensed
Psychological Examiner who examined plaintiff on one occasion, plaintiff's
treating psychologist and psychiatrist have opined differently.  Plaintiff has
also been hospitalized on multiple occasions due to symptoms of depression,
the most recent of which concluded with a discharge prognosis of "poor" (Tr.
519), and the assessments of her GAF by multiple sources have consistently
revealed moderate symptoms at best (Tr. 490, 518, 528).  While the ALJ
characterized her depression as intermittent and in response to "situational
stressors," Dr. Gaboy noted that plaintiff's situational stressors included
"poor support system, financial difficulty and medical problem," as well as
her separation from her mentally ill spouse, which stressors would not appear
likely to resolve in the short term.  Dr. Gaboy further noted at the
conclusion of the majority of their sessions that plaintiff was not clinically
stable.  (Tr. 468-490).

Case 3:04-cv-01093   Document 14   Filed 08/04/05   Page 29 of 31 PageID #: 29

> application.  We will make every reasonable effort
> to help you get medical reports from your own
> medical sources when you give us permission to
> request the reports.
>
> 20 C.F.R. § 404.1512(d)(1998). ... This regulation does
> not in and of itself bind the ALJ to issue a subpoena.
> "Every reasonable effort" is defined as a request for
> information and a follow-up ten to twenty days
> afterward if the information has not been received.  20
> C.F.R. § 404.1512(d)(1).  Nevertheless, the regulation
> expresses the general duty of inquiry and policy of
> assisting claimants...

Id. at *1 & n.1.

In light of the reasoning in Gray and the language of the Commissioner's regulations, as well as the facts and findings in this particular case with regard to plaintiff's mental impairment, the undersigned must conclude that the psychotherapy and other treatment notes of longstanding treating psychologist Dr. McElroy were more than reasonably necessary for the full presentation of plaintiff's case, to the extent that the ALJ abused his discretion in failing to order their production.  That said, the undersigned would reiterate that the blame in this case is to a large extent shared.

The case should be remanded for further administrative proceedings including the issuance of a new decision in light of Dr. McElroy's notes, the production of which should first be sought by plaintiff's explicit authorization and request, and then if necessary, by the issuance of an administrative order and subpoena at government expense.

## IV. RECOMMENDATION

In light of the foregoing, the Magistrate Judge recommends that plaintiff's motion for judgment on the administrative record be **GRANTED**, and that the decision of the Commissioner be **REVERSED** and the cause **REMANDED** for further administrative proceedings, to include if necessary the issuance of a subpoena for the psychotherapy notes and other treatment records of plaintiff's treating psychologist.

Any party has ten (10) days from receipt of this Report and Recommendation in which to file any written objections to it with the District Court. Any party opposing said objections shall have ten (10) days from receipt of any objections filed in which to file any responses to said objections. Failure to file specific objections within ten (10) days of receipt of this Report and Recommendation can constitute a waiver of further appeal of this Recommendation. Thomas v. Arn, 474 U.S. 140 (1985); Cowherd v. Million, 380 F.3d 909, 912 (6th Cir. 2004)(en banc).

**ENTERED** this 4th day of August, 2005.


  /s/ Joe B. Brown
JOE B. BROWN
United States Magistrate Judge

31